**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

BLACK CREEK CAPITAL MARKETS, LLC,
f/k/a DIVIDEND CAPITAL SECURITIES, LLC,

        Plaintiff,
v.

PURSHE KAPLAN STERLING INVESTMENTS, and
GOPI KRISHNA VUNGARALA,

        Defendants.

## VERIFIED COMPLAINT

Plaintiff Black Creek Capital Markets, LLC f/k/a Dividend Capital Securities, LLC ("Black Creek" or "Plaintiff"), for its complaint against Purshe Kaplan Sterling Investments, Inc. ("PKS") and Gopi Krishna Vungarala ("Vungarala") (collectively, "Defendants"), states and alleges as follows:

### INTRODUCTION

1.    The relationship between Black Creek and PKS is defined by a dealer agreement. This agreement clearly and unequivocally requires that any disputes relating to the parties' relationship under the agreement be submitted to binding American Arbitration Association ("AAA") arbitration in Denver, Colorado. Nevertheless, in breach of this arbitration requirement, PKS and its registered representative (at all times relevant), Vungarala, have pursued third party claims against Black Creek in a Financial Industry Regulatory Authority ("FINRA") Arbitration pending in Detroit, Michigan.

2.	As Defendants' actions are in direct violation of the arbitration provision in the agreement between Black Creek and PKS, Plaintiff seeks an order from this Court under the Federal Arbitration Act, 9 U.S.C. § 4, and pursuant to the parties' agreement, enjoining the arbitration of third party claims brought by Defendants against Black Creek in FINRA Arbitration No. 17-00885 currently pending in Detroit, Michigan, and compelling the parties to arbitrate any disputes, including those third-party claims, in AAA arbitration in Denver, Colorado, as required by the agreement between Black Creek and PKS.

## THE PARTIES

3.	Plaintiff Black Creek is a Colorado limited liability company with its principal place of business in Denver, Colorado.  Black Creek has no members that are citizens of New York or Michigan.

4.	Defendant PKS is a corporation organized under the laws of the State of New York with its principal place of business in Albany, New York.

5.	Upon information and belief, Defendant Vungarala was a registered representative of PKS for all relevant time periods and is domiciled in Midland, Michigan.

## JURISDICTION AND VENUE

6.	This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the underlying controversy between the parties arises under federal securities laws, including § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and its corresponding Rule 10b-5, 17 C.F.R. 240.10b-5.  *See Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009) ("[A] federal court should determine its jurisdiction by "looking through" a § 4 petition to the parties' underlying substantive controversy.").

7. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and more than $75,000, exclusive of interest and costs, at stake in the underlying dispute between the parties.

8. Defendants consented to jurisdiction in this district through the arbitration clause in the agreement with Black Creek, which specifies Denver, Colorado, as the location for any arbitration.

9. Venue is proper in this judicial district because, pursuant to 9 U.S.C. § 4, a party should seek to compel arbitration in the judicial district where the parties agreed to arbitrate any disputes between them. The parties agreed to arbitrate their disputes in Denver, Colorado.

**FACTS**

10. Black Creek distributes investments in Real Estate Investment Trusts ("REITs") to other dealers. Black Creek first contracts with a REIT to act as the dealer manager for the REIT. As dealer manager, Black Creek coordinates with broker-dealers to offer the investment to investors. To that end, Black Creek contracts with broker-dealers to authorize the broker-dealers to sell the REIT at issue to the ultimate investors. Absent a broker-dealer agreement, a broker-dealer cannot sell investments in a REIT managed by Black Creek.

11. PKS is a registered broker-dealer under the laws, rules, and regulations promulgated by the Securities and Exchange Commission ("SEC") and is a member of FINRA. As a broker-dealer, PKS enters into agreements with either dealer managers (such as Black Creek) or directly with investments, which authorize PKS to act as a broker-dealer for those investments covered by the agreements. In turn, PKS, acting through its registered representatives, sells investments to investors. It is only through the execution of a broker-dealer

3

agreement that a broker-dealer such as PKS is authorized to sell shares of a particular investment.

12. At all times relevant to the underlying dispute, Vungarala was a registered representative of PKS, as licensed by FINRA. A registered representative is a representative of a broker-dealer through which the broker-dealer executes its duties in selling shares of investments. A registered representative, such as Vungarala, is only authorized to sell shares of investments by virtue of his affiliation with a broker-dealer, who has agreements to sell specific investments, and licensure by FINRA.

*The Selected Dealer Agreement*

13. Industrial Income Trust, Inc. ("Industrial") was a REIT that owned or managed income-producing real estate.

14. On or about February 27, 2012, Black Creek entered into a Dealer Manager Agreement with Industrial to be its dealer manager for up to $2.4 billion in common shares of Industrial as set forth in a July 1, 2011, registration statement and prospectus filed with the SEC ("Dealer Manager Agreement"). Pursuant to this agreement, Black Creek was to use its best efforts to sell and to manage the sale of the shares by other participating broker-dealers. A true and correct copy of the Dealer Manager Agreement is attached hereto as Exhibit 1. *See also* Exhibit 5, Affidavit of Brian Magner (authenticating Exhibits 1-4).

15. On or about August 14, 2012, PKS and Black Creek executed a Selected Dealer Agreement for PKS to be a dealer for the $2.4 billion in shares of Industrial covered by the Dealer Manager Agreement ("Selected Dealer Agreement"). A true and correct copy of the

4

Selected Dealer Agreement is attached hereto as Exhibit 2.  *See also* Exhibit 5, Affidavit of Brian Magner (authenticating Exhibits 1-4).

16. Section XIII of the Selected Dealer Agreement provides:

> Any dispute, controversy or claim arising between the parties relating to this Agreement (whether such dispute arises under any federal, state or local statute or regulation, or at common law), shall be resolved by final and binding arbitration administered in accordance with the then current rules of the American Arbitration Association ("AAA").  Any matter to be settled by arbitration shall be submitted to the AAA in Denver, Colorado and the parties agree to abide by all awards rendered in such proceedings.

Exhibit 2, Selected Dealer Agreement, Section XIII.

17. The Selected Dealer Agreement expressly incorporates the Dealer Manager Agreement.  *Id.* at Section I.

18. The Dealer Manager Agreement includes a substantively identical arbitration clause as that provided in the Selected Dealer Agreement.  Exhibit 1, Dealer Manager Agreement, Section 8.

19. In accordance with the Dealer Manager Agreement and the Selected Dealer Agreement, Black Creek disseminated the registration statement and prospectus filed with the SEC on July 1, 2011, to PKS, among other dealers.

20. Upon information and belief, Vungarala served as an investment manager and advisor to the Saginaw Chippewa Indian Tribe of Michigan ("Tribe").

21. The Selected Dealer Agreement and the Dealer Manager Agreement may collectively be referred to herein as the "Agreements."

5

### *The FINRA Arbitration*

22. On or about April 5, 2017, the Tribe initiated FINRA Arbitration No. 17-00885 against PKS and Vungarala (an investment manager for the Tribe and a registered representative with PKS), alleging that Vungarala, through PKS, improperly directed the Tribe's investments into a variety of non-traded REITs and Business Development Companies ("BDCs"). A true and correct copy of the FINRA Statement of Claim is attached hereto as Exhibit 3. *See also* Exhibit 5, Affidavit of Brian Magner (authenticating Exhibits 1-4).

23. The Tribe alleges that these investments in non-traded REITs and BDCs were contrary to the Tribe's investment strategy and were completed without full disclosure regarding: the nature of the investments, Vungarala and PKS's conflict of interest in selling the investments, and the availability of possible discounts in connection with the purchase of certain quantities of the non-traded REITs and BDCs. *See* Exhibit 3, FINRA Statement of Claim.

24. On or about February 4, 2016, FINRA filed Disciplinary Proceeding No. 2014042291901 against PKS and Vungarala for their actions or inactions in selling and/or recommending investments to the Tribe, essentially the same actions at issue in the FINRA Arbitration.

25. By order dated February 21, 2017, FINRA accepted and approved an Offer of Settlement with respect to the disciplinary charges against PKS. FINRA found, among other things, that Vungarala failed to disclose his conflict of interest in the sale of non-traded REITs and BDCs to the Tribe and failed to disclose the availability of discounts for the Tribe's purchases, and that PKS failed to appropriately supervise Vungarala, resulting in the Tribe's purchase of approximately $190 million in investments from PKS through Vungarala and the

payment of approximately $11.9 million in commissions to PKS, with $9 million going to Vungarala specifically. Among other things, FINRA ordered PKS to pay a $750,000 fine and approximately $3.3 million in restitution to the Tribe.

26. FINRA did not make any finding that the offering documents at issue contained material misrepresentations or omissions.

27. One of the investments the Tribe alleges Defendants improperly and unlawfully sold to the Tribe was the Industrial shares. *See* Exhibit 3, FINRA Statement of Claim, Schedule A, p. 49 (listing Industrial Income Trust).

28. Upon information and belief, Vungarala recommended to the Tribe the purchase of $2.5 million in Industrial shares in or about July 2013. Pursuant to the Dealer Manager Agreement and the Selected Dealer Agreement, which authorized Vungarala to make the recommendation, in July 2013 the Tribe purchased $2.5 million in Industrial shares through PKS and Vungarala.

29. Beginning in October 2013 the Tribe began receiving quarterly distributions from its Industrial investments. In November 2015 the Tribe received liquidation proceeds due to a liquidity event. In total, the Tribe received $2.93 million on its $2.5 million investment in Industrial.

30. The sole and exclusive way that PKS was able to sell the Industrial shares was by virtue of its status as a dealer under the Selected Dealer Agreement with Black Creek. *See* Exhibit 2, Selected Dealer Agreement.

31. The sole and exclusive way that a registered representative, such as Vungarala at all times relevant, was able to recommend and advise an investor, such as the Tribe, to purchase

the Industrial shares and receive commissions for said purchases, was as a licensed and registered representative of a broker-dealer such as PKS, which was, in turn, authorized to sell the Industrial shares solely by virtue of the Selected Dealer Agreement.

32. On June 30, 2017, Defendants filed an answer to the FINRA Statement of Claim. In addition, Defendants asserted a third party claim alleging negligence, contribution, and indemnification against seventeen (17) dealer managers for the investments in which the Tribe invested and that are at issue in the Tribe's claims, including Black Creek ("Third Party Claims"). A true and correct copy of the Answer and Third Party Complaint is attached hereto as Exhibit 4. *See also* Exhibit 5, Affidavit of Brian Magner (authenticating Exhibits 1-4).

33. Though denying any misrepresentations, concealments, or securities violations with respect to the Tribe's investments, Defendants allege in the Third Party Claims that, to the extent they are liable to the Tribe, their liability was the result of defects in the registration statements, prospectuses, and other materials for the Tribe's investments that were prepared and disseminated by the investment entities and the investment dealer managers, including Black Creek. Exhibit 4, Third Party Claims, p. 30, ¶¶ 5-6.

34. Because PKS's Third Party Claims against Black Creek relate to PKS's sale of the Industrial shares pursuant to the Selected Dealer Agreement, they are covered by the arbitration provision in the Agreements.

35. Because Vungarala's Third Party Claims against Black Creek relate to his actions to recommend and advise the Tribe to purchase the Industrial shares and his receipt of commissions for the Tribe's purchases of Industrial shares, both of which occurred only by virtue of his status as a registered representative of PKS, Vungarala's Third Party Claims are

8

covered by the arbitration provision in the Agreements. *See Meister v. Stout*, 353 P.3d 916, 920 (Colo. Ct. App. 2015) ("[A] signatory to an arbitration agreement may compel arbitration of a claim brought against it by a nonsignatory plaintiff, so long as the claim arises from the agreement containing the arbitration provision.").

36. The specific arbitration provisions in the Agreements prescribing AAA arbitration in Denver, Colorado supersede any arbitration provision under the rules of the Financial Industry Regulatory Authority. *See Credit Suisse Sec. (USA) LLC v. Tracy*, 812 F.3d 249, 254, 256 (2d Cir. 2016) (compelling JAMS arbitration and enjoining FINRA arbitration based on the parties' agreement because "in a conflict between a[ self-regulatory organization's] broad arbitration rules and a specific pre-dispute agreement . . . the more specific agreement will prevail"); *see also UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 328 (4th Cir. 2013) (recognizing that the "obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties" as long as the parties' agreement is sufficiently specific and explicit); *Ameriprise Fin. Servs., Inc. v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113, 132 (2d Cir.2011) ("In particular, as relevant here, different or additional contractual arrangements for arbitration can supersede the rights conferred on a customer by virtue of a broker's membership in a self-regulating organization such as FINRA."); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) ("[A] contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules.").

37. Counsel for Black Creek contacted Defendants' counsel regarding the claims in the FINRA Arbitration and requested that the claims against Plaintiff be dismissed or submitted to AAA arbitration, but Defendants have refused.

9

## COUNT ONE
### (Compel Arbitration under the Federal Arbitration Act as to All Defendants)

38. Plaintiff repeats and realleges paragraphs 1 through 37 hereof, as if fully set forth within.

39. Black Creek and PKS have entered into a binding agreement relating to the sale of shares of the Industrial REIT, specifically the Selected Dealer Agreement, expressly incorporating the Dealer Manager Agreement.

40. In the Third Party Claims, PKS, and its registered representative at all times relevant, Vungarala, have identified and raised claims against Black Creek relating to the dissemination of materials for the sale of shares of the Industrial REIT and the ultimate sale of those shares to the Tribe. Thus, these claims relate to the Selected Dealer Agreement, expressly incorporating the Dealer Manager Agreement.

41. Each of the Selected Dealer Agreement and the Dealer Manager Agreement include provisions requiring all disputes relating to the respective agreements be submitted to binding AAA arbitration in Denver, Colorado.

42. PKS is bound to the arbitration provisions in the Agreements as a signatory to the Selected Dealer Agreement.

43. Vungarala is bound to the arbitration provisions in the Agreements because his claims against Black Creek relate to the sale of shares of the Industrial REIT and his receipt of commissions for such sales, which arise solely from his status as a registered representative of PKS at the time of those sales. The only reason Vungarala was able to recommend the sale of Industrial was because he was a registered representative of PKS and PKS had executed the Selected Dealer Agreement. *See Meister v. Stout*, 353 P.3d 916, 920 (Colo. Ct. App. 2015).

44. By reason of the foregoing, the court should issue an order compelling arbitration of the disputes raised by Defendants in the Third Party Claims in accordance with the terms of the Agreements, specifically AAA arbitration in Denver, Colorado and, in connection, enjoining all other forms of dispute resolution for these claims. *See, e.g.*, *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 352 (S.D.N.Y. 2010) (enjoining defendant from pursuing claims in FINRA Arbitration pursuant to 9 U.S.C. § 4).

## COUNT TWO
### (Specific Performance against PKS)

45. Plaintiff repeats and realleges paragraphs 1 through 44 hereof, as if fully set forth within.

46. Black Creek and PKS have entered into binding agreements relating to the sale of shares of Industrial, specifically the Selected Dealer Agreement, expressly incorporating the Dealer Manager Agreement.

47. Black Creek has abided by all of its obligations under the Agreements and is willing and able to abide by all of its continuing obligations under the Agreements.

48. The Selected Dealer Agreement and the Dealer Manager Agreement are valid and binding and include provisions requiring all disputes relating to the respective agreement be submitted to binding AAA arbitration in Denver, Colorado.

49. PKS, itself and through its registered representative at all relevant times Vungarala, has breached these provisions by asserting the Third Party Claims against Black Creek relating to the Selected Dealer Agreement in the FINRA Arbitration.

50. As a direct and proximate result of PKS's actions, both itself and through its registered representative at all relevant times Vungarala, Black Creek has been deprived of the

benefit of its contract with PKS as it has been, and will be, forced to litigate disputes relating to the Selected Dealer Agreement in a forum different than that for which it contracted; namely, the Third Party Claims in the FINRA Arbitration.

51. Legal remedies are inadequate to compensate Black Creek for Defendants' breach as it will have been deprived of the benefit of its contracted for dispute resolution process.

52. Specific performance is equitable and just given the foregoing.

53. By reason of the foregoing, PKS should be required to specifically perform under the Agreements and submit all disputes relating to the Agreements, including the Third Party Claims, solely to AAA arbitration in Denver, Colorado and cease pursuit of any claims related to the Agreements in any other forum.

## COUNT THREE
### (Declaratory Judgment)

54. Plaintiff repeats and realleges paragraphs 1 through 53 hereof, as if fully set forth within.

55. Black Creek and PKS have entered into binding agreements relating to the sale of shares of the Industrial shares, specifically the Selected Dealer Agreement, expressly incorporating the Dealer Manager Agreement.

56. The Selected Dealer Agreement and the Dealer Manager Agreement include provisions requiring all disputes relating to the respective agreement be submitted to binding AAA arbitration in Denver, Colorado.

57. PKS, itself and through its registered representative at the time Vungarala, has violated these provisions by asserting the Third Party Claims against Black Creek relating to the Selected Dealer Agreement in the FINRA Arbitration.

58. As a direct and proximate result of PKS's actions, both itself and through its registered representative at all relevant times Vungarala, Black Creek has been, and will be, forced to litigate disputes relating to the Selected Dealer Agreement in a forum different than that for which it contracted; namely, the Third Party Claims in the FINRA Arbitration.

59. By reason of the foregoing, Black Creek seeks a declaratory judgment that it cannot be compelled or required to arbitrate the Third Party Claims against it, or any other disputes related to the Agreements, in the FINRA Arbitration.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Black Creek requests that the Court enter an Order:

1. Compelling Defendants to submit all claims relating to the Selected Dealer Agreement, including those styled as the Third Party Claims in the FINRA Arbitration No. 17-00885, to binding AAA arbitration in Denver, Colorado pursuant to the Agreements;

2. Enjoining Defendants from pursuing the Third Party Claims against Black Creek in FINRA Arbitration No. 17-00885;

3. Directing PKS to specifically perform under the Agreements and submit all claims relating to the Selected Dealer Agreement, including those styled as the Third Party Claims in the FINRA Arbitration No. 17-00885, solely to binding AAA arbitration in Denver, Colorado;

4. Directing PKS to cease pursuing any and all claims relating to the Selected Dealer Agreement, including those styled as the Third Party Claims in the FINRA Arbitration No. 17-00885, in any forum that is inconsistent with the Agreements;

5.      Entering a declaratory judgment that Black Creek cannot be compelled or required to arbitrate the Third Party Claims against it, or any other disputes related to the Agreements, in the FINRA Arbitration; and

6.      Awarding Black Creek such other and further relief as the Court deems just and proper.

Respectfully submitted this 21st day of September, 2017.

        BRYAN CAVE LLP

        *s/Desmonne A. Bennett*
        Desmonne A. Bennett
        E-Mail: desmonne.bennett@bryancave.com
        1700 Lincoln Street, Suite 4100
        Denver, CO 80203
        Telephone:  (303) 861-7000
        Facsimile:  (303) 866-0200

        Jeffrey J. Kalinowski
        E-Mail: jeffrey.kalinowski@bryancave.com
        Jason A. Kempf
        E-Mail: jason.kempf@bryancave.com
        One Metropolitan Square
        St. Louis, MO 63102
        Telephone:  (314) 259-2306
        Facsimile:  (314) 552-8306

        ATTORNEYS FOR BLACK CREEK CAPITAL MARKETS, LLC f/k/a DIVIDEND CAPITAL SECURITIES, LLC

## **VERIFICATION**

| | |
|---|---|
| STATE OF COLORADO | ) |
| | ) ss. |
| CITY AND COUNTY OF DENVER | ) |

I, Brian Magner, declare as follows:

1. I am a Senior Vice President and Chief Compliance Officer for Plaintiff Black Creek Capital Markets, LLC f/k/a Dividend Capital Securities LLC ("Black Creek").

2. I have personal knowledge of Black Creek and its activities, including those set out in the foregoing Verified Complaint ("Complaint") and if called on to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Complaint concerning Black Creek and its activities are true and correct to the best of my knowledge and that the factual statements asserted upon information and belief are believed to be true.

4. In addition to this verification, I have executed an affidavit authenticating Exhibits 1-4 herein. My affidavit is attached to this Complaint as Exhibit 5.

*s/Brian Magner*

Brian Magner
Senior Vice President
Chief Compliance Officer
Black Creek Capital Markets, LLC f/k/a
Dividend Capital Securities, LLC

Subscribed and sworn to before me by Brian Magner, the 21st day of September, 2017. WITNESS MY HAND AND OFFICIAL SEAL.

*s/Rhonda Poelma*
Notary Public
My Commission Expires: August 5, 2012

15